**DANDEN PETROLEUM, INC., a Texas Corporation, and J.B. Watkins, Plaintiffs,**

v.

**NORTHERN NATURAL GAS COMPANY, Now named Internorth, Inc., a Delaware Corporation, Defendant.**

Civ. A. No. CA–2–85–86.

United States District Court, N.D. Texas, Amarillo Division.

Aug. 14, 1985.

Jody G. Sheets, Gassaway, Gurley, Sheets & Mitchell, Borger, Tex., for plaintiffs.

W. Robert Brown, Orran Lee Brown, Miller, Keeton, Bristow & Brown, Houston, Tex., and Patrick J. McCarthy, Joseph F. Furay, InterNorth, Inc., Omaha, Neb., for defendant.

## ORDER

MARY LOU ROBINSON, District Judge.

Plaintiffs have moved the Court for a preliminary injunction, enjoining Defendant from violating the provisions of the take-or-pay clause in a contract for the sale of natural gas. An evidentiary hearing was held on July 16–18, 1985. The Court's Findings of Fact and Conclusions of Law, in accordance with Fed.R.Civ.P. 52, appear in Parts I and II of this Order.

Defendant has asked the Court to stay this action and refer certain issues raised by the action, most notably the question of whether payments under this take-or-pay clause would violate the Natural Gas Policy Act, to the Federal Energy Regulatory Commission under the doctrine of primary jurisdiction. The Court's discussion of this motion appears in Part III of this Order.

## I. FINDINGS OF FACT

1. This action was brought by Plaintiffs Danden Petroleum, Inc., a Texas corporation and J.B. Watkins, a Texas resident ("Plaintiffs"), against Northern Natural Gas Company, a division of InterNorth, Inc., a Delaware corporation ("Inter-North").

2. Plaintiffs' claims are based on the "take or pay" provisions of a Gas Purchase Contract ("Contract") dated May 14, 1974, under which InterNorth purchases from Plaintiffs natural gas produced from 14 wells located in Hansford County, Texas. Plaintiffs claim that InterNorth is in breach of such provisions.

3. The take or pay provisions of the Contract are found in Article III, as follows:

*Section 2. Northern's Obligation to Purchase Gas When Gas Production is NOT Prorated.* Commencing with the date of initial delivery and continuing for a period of sixty (60) months, Northern agrees to purchase and receive from Seller's interest in each producing and connected gas well, located on the acreage set forth on Exhibit A, a daily volume of gas, averaged over each Contract Year, equal to one million (1,000,000) cubic feet of gas for each three billion, six hundred fifty million (3,650,000,000) cubic feet of recoverable gas reserves.

At the end of said sixty (60) months, and continuing for the remaining term of this Contract, Northern agrees to purchase and receive from Seller's interest in each producing and connected gas well, located on the acreage set forth on Exhibit A, a daily volume of gas, averaged over each Contract Year, equal to one million (1,000,000) cubic feet of gas for each seven billion, three hundred million (7,300,000,000) cubic feet of recoverable gas reserves.

If Seller's interest in any gas well is less than one hundred percent (100%), Northern's obligation to purchase the aforementioned volumes shall be reduced in proportion to the interest in said gas well or wells held by Sellers other than Seller hereunder.

The above volume is herein referred to as Seller's Contract Volume. If Seller's Contract Volume is not purchased and received and same was available for delivery hereunder, then Northern agrees to pay for the deficiency in purchases as herein provided.

*Section 3. Northern's Obligation to Purchase Gas When Gas Production IS Prorated.* Northern, during each Contract year, agrees to nominate to the proper authority, for Seller's interest in each prorated gas well, a volume of gas equal to or in excess of the volume specified in Section 2 of this Article III; provided the volume nominated shall not exceed the ability of the well to produce. Should proration regulations require nominations to be made by producers, Northern will advise Seller of the volume of gas to be nominated for Seller's interest in each such gas well, and Seller agrees to nominate such volume of gas for such interest.

The allowable volume of gas attributable to Seller's interest in each prorated, producing and connected gas well shall be Seller's Contract Volume and Northern, during such Contract Year, agrees to purchase and receive Seller's Contract Volume from each such well. If such volume is not purchased and received and same was available for delivery hereunder from such well, then Northern agrees to pay for the deficiency in purchases as herein provided.

4. The gas wells involved in this action are subject to proration under the rules and regulations of the Texas Railroad Commission.

5. "Seller's Contract Volume" is defined in Article I, § 11 of the Contract as "that volume of gas which Northern is obligated to purchase under Article III hereof."

6. "Allowable" is defined in Article I, § 12 of the Contract as "a volume of gas allocated by any duly constituted authority having jurisdiction to any well under a valid order prorating gas production."

7. InterNorth is presently purchasing and receiving from Plaintiffs each well's ratable share of InterNorth's market demand, based on the allowable assigned to each subject well by the Railroad Commission.

8. Make-up of deficient purchases and nominations relative to make-up are set forth in Article III of the Contract as follows:

*Section 4. Make-Up of Deficient Purchases.* If, during any Contract year, Northern pays for gas which it does not receive, it shall have the right, during the next succeeding five (5) Contract years, to receive all or any part of such gas, without further payment therefor, by taking more than Seller's Contract Volume during period of non-proration or, during proration, by following the procedure prescribed later in this section.

In order that Northern shall have a reasonable opportunity to make up deficient purchases during proration, both Northern and Seller agree to initiate and pursue diligently such actions as may be available, under the rules and procedures prescribed by the regulatory body having jurisdiction, to prevent the cancellation of allowables, or, in the event of cancellation, the reinstatement of same.

Northern may make-up gas during proration as follows:

The nominating party will nominate a volume of gas specified by Northern which is equal to or in excess of the volume specified in Section 2 of this Article III; provided, the volume nominated shall not exceed one hundred twenty-five percent (125%) of the volume specified in said Section 2 nor shall it exceed the ability of the well or wells to produce. Northern's obligation to purchase will be the lesser of the allowable volume of gas attributable to Seller's interest or 80% of the ability of Seller's well or wells to

produce. The percent of said obligation to be used as make-up gas against prior deficient purchases will be the percent by which the volume nominated exceeds the volume specified in said Section 2; provided, if the volume nominated equals the ability of the well to produce, twenty percent (20%) of the allowable shall be used as make-up gas.

9. Limitations on InterNorth's obligation to purchase gas under the Contract are set out in Article III as follows:

*Section 5. Limitations Upon Northern's Obligation to Purchase Gas.*

(a) *Excess Delivery Capacity of Seller's Wells.* Northern's obligation to purchase gas under this Contract is conditioned upon each well at all times having the physical and legal capability of delivering into the gathering line serving such well at the point of delivery against the operating pressure prevailing therein, a daily volume of gas equal to at least 125% of Northern's obligation to purchase therefrom. If any such well does not have the physical and legal capability of so delivering, then the average daily volume which Northern shall be obligated to purchase from such well shall be reduced to 80% of the daily volume which such well is capable of so delivering.

10. Section 2 of Article XIV of the Contract provides as follows:

*Section 2. Regulatory Jurisdiction.* This Contract is subject to all valid legislation, both State and Federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction.

## II. CONCLUSIONS OF LAW

■ 1. The purpose of a preliminary injunction is to prevent irreparable injuries so as to preserve the trial court's ability to render a meaningful decision on the merits. *Mississippi Power & Light Co. v. United Gas Pipe Line,* 760 F.2d 618 (5th Cir.1985); *Canal Authority v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974).

2. It is well established that a preliminary injunction is "an extraordinary and drastic remedy." *Canal Authority v. Callaway, supra,* 489 F.2d at 573; *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana ("CEPE"),* 762 F.2d 464, 472 (5th Cir.1985).

■ 3. In order to secure a preliminary injunction, the Plaintiffs have the burden of proving four elements:

(1) a substantial likelihood of success on merits;

(2) a substantial threat that the Plaintiffs will suffer irreparable injury if the injunction is not issued;

(3) that the threatened injury to the Plaintiffs outweighs any damage the injunction may cause to InterNorth; and

(4) that the injunction will not disserve the public interest.

*Enterprise International, Inc. v. CEPE, supra; Mississippi Power & Light Co. v. United Gas Pipe Line, supra; Interox America v. PPG Industries, Inc.,* 736 F.2d 194 (5th Cir.1984); *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384 (5th Cir.1984); *Meridian v. Algernon Blair, Inc.,* 721 F.2d 525 (5th Cir.1983); *Commonwealth Life Ins. Co. v. Neal,* 669 F.2d 300 (5th Cir.1982); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir.1981); *Dallas Cowboy Cheerleaders v. Scoreboard Posters, Inc.,* 600 F.2d 1184 (5th Cir.1979); *Canal Authority v. Callaway, supra.*

4. The movant on an application for preliminary injunction "has a heavy burden of persuading the district court that all four elements are satisfied." *Hardin v. Houston Chronicle Publishing Co.,* 572 F.2d 1106, 1107 (5th Cir.1978); *Enterprise International, Inc., v. CEPE, supra.*

5. A preliminary injunction "should only be granted if the movant has clearly carried the burden of persuasion on all four ... prerequisites," since the "decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas Pipe Line, supra,* 760 F.2d at 621.

■ 6. If the movant does not succeed in carrying this burden on any one of the four prerequisites, a preliminary injunction may not issue. *Enterprise International, Inc. v. CEPE, supra; Clements Wire & Mfg. Co. v. NLRB,* 589 F.2d 894, 897 (5th Cir.1979). When the movant fails to prove that, absent the injunction, irreparable injury will result, the preliminary injunction should be denied. *Enterprise International, Inc. v. CEPE, supra; Canal Authority v. Calloway, supra,* 489 F.2d at 574.

7. Plaintiffs have failed to carry their burden of persuasion on the first element of the preliminary injunction analysis. Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their claim that InterNorth is in breach of the take or pay provisions of the Contract.

8. Pursuant to Chapter 86 of the Texas Natural Resources Code, Tex.Nat.Res.Code Ann. §§ 86.001 *et seq.,* the Texas Railroad Commission presides over a comprehensive body of conservation laws and regulations designed to ensure the production and use of natural gas in accordance with market demand and to prevent its overproduction or waste.

9. The Railroad Commission Market Demand Order, Special Order File No. 20–68,-382, Rule 051.02.99.001, 16 Tex.Admin.Code § 3.91, requires InterNorth to nominate monthly to the Railroad Commission a volume of gas equal to the quantity of gas for which InterNorth is the ultimate consumer and the quantity nominated by its downstream purchasers based on a firm forecast of that purchaser's actual demand. § (d). In 1982, the Railroad Commission informed InterNorth that it was in violation of the Market Demand Order and required Inter-North to take remedial action to bring its nominations into compliance.

10. Pursuant to § (e) of the Market Demand Order, InterNorth must ratably apportion its nominations on Form T–3 and its actual take from all gas wells connected to its systems so that takes from various gas producing properties are made without discrimination in favor of one producer or person as against another in the same field, and without unjust or unreasonable discrimination as between fields.

11. Pursuant to § (e)(1) of the Market Demand Order, InterNorth must base its nominations on each well's deliverability as reflected by the well's Form G10 on file with the Commission, and actual takes of gas by InterNorth must be based on the Commission's assigned allowable for each well.

12. Violation of the Market Demand Order is subject to a penalty of $1,000.00 per day for each violation, pursuant to Tex. Nat.Res.Code Ann. § 86.222.

13. The Railroad Commission is a duly constituted authority having jurisdiction and assigns allowables to each of Plaintiffs' wells under the Market Demand Order, a valid order prorating gas production, which limits the volume each well is permitted to produce and which InterNorth is permitted to take monthly.

14. Each of Plaintiffs' wells lacks the ability to produce more than the Commission allowable assigned to that well and lacks the legal capability of delivering more than that allowable within the meaning of Article III, Sections 3, 4, and 5 of the Contract.

■ 15. Under the terms of the Contract, in conjunction with the Market Demand Order, InterNorth is required to nominate and take from Plaintiffs' wells no more than the allowable assigned to each well by the Railroad Commission and, under Sections 4 and 5 of Article III, its obligation to purchase equals 80% of that allowable. Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their claim that InterNorth is in breach of such obligation.

16. Plaintiffs have failed to demonstrate a substantial threat that they will suffer irreparable injury if the injunction is not issued.

■ 17. It is not so much the magnitude of the harm claimed by Plaintiffs but

the "irreparability that counts for purposes of a preliminary injunction." *Canal Authority v. Calloway, supra*, 489 F.2d at 575. "The key word ... is irreparable." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975). *See also, Enterprise International, Inc. v. CEPE, supra.*

18. An injury is irreparable if it cannot be undone through monetary relief. Injuries which can be compensated by money damages at a later time are not irreparable and do not warrant the extraordinary remedy of an injunction. *Enterprise International, Inc. v. CEPE, supra; Interox America v. PPG Industries, Inc., supra; Deerfield Medical Center v. City of Deerfield Beach, supra; Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir.1981). Loss of income during the pendency of a suit is not irreparable injury for which an injunction will lie. *Aldrich v. Skillern & Sons, Inc.*, 493 F.Supp. 1073 (N.D.Tex.1980).

19. Plaintiffs' claim of injury from denial of the use and enjoyment of the proceeds of production is a claim of monetary injury, which can be calculated and compensated in full by a judgment for money damages at a later time if Plaintiffs prevail at trial on the merits, and accordingly is not an irreparable injury.

20. Plaintiffs have failed to demonstrate a substantial threat that they will suffer drainage of their reserves in the absence of an injunction, that any drainage would result in irreparable harm not compensable in money damages if Plaintiffs prevail at trial, or than an injunction would in any respect prevent any drainage.

21. Plaintiffs have failed to establish that the threatened injury to them in the absence of an injunction outweighs any damage the injunction might cause to InterNorth. Plaintiffs' primary injury claimed in the absence of an injunction is monetary—the denial of the use and enjoyment of the funds it asserts a right to receive from InterNorth each month. If InterNorth is forced to make such payments, it too would suffer the same harm. Where the harms are equivalent, an injunc-

tion is improper. *Apple Barrel Productions, Inc. v. Beard, supra.* In addition, an injunction would cause further injury to InterNorth by exposing it to the risk that it will not be able to recover such payments from Plaintiffs out of future production within the five-year make-up period.

22. Plaintiffs have failed to demonstrate that the injunction would not disserve the public interest. The public has no interest in enhancing the flow of funds to Plaintiffs each month from InterNorth. An injunction would disserve the public interest by causing InterNorth to nominate or take gas in excess of the Market Demand Order and the true demand for such gas, and may result in higher prices for gas to the downstream consumers of such gas. The *Mississippi Power & Light Co.* court saw the latter as a "vital" public interest.

23. For these reasons, Plaintiffs' Application for a Preliminary Injunction is denied.

## III. THE MOTION TO REFER TO FERC

The demands and claims of the Plaintiffs raise the question of whether enforcement of the take-or-pay provisions of the gas purchase contract at issue in this case would violate the price ceilings established by Title I of the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301 *et seq.* InterNorth argues that this issue is within the primary jurisdiction of the FERC and involves public policy issues that should be resolved, at least in the first instance, by the Federal Energy Regulatory Commission.

*The Regulatory Scheme Established by the NGPA*

A brief discussion of the regulatory background against which this action operates is necessary for resolution of this Motion. By enacting the NGPA in 1978, Congress established a comprehensive regulatory scheme, including price ceilings, for the wholesale gas market consisting of "first sales" of natural gas. Prior to that time, between 1938 and 1978, the Federal

Power Commission ("FPC") had regulated sales of natural gas in interstate commerce pursuant to the Natural Gas Act, 15 U.S.C. § 717 *et seq.* ("NGA"). That statute was enacted out of concern that the monopoly power of interstate pipelines was harming the welfare of natural gas consumers. It authorized the FPC to establish "just and reasonable" rates for gas sales at the downstream end of interstate pipelines. The United States Supreme Court, in *Phillips Petroleum Company v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), held that the NGA required the FPC to take jurisdiction over independent gas producers as well and to examine the reasonableness of the rates they charged to interstate pipelines. Over the years, the FPC variously applied "cost of service," "area rate," and "national rate" approaches to calculate the rate schedules for sales of natural gas by producers to pipelines. Largely because of the insufficiency of these measures, Congress enacted the NGPA to allow the FPC and its successor, the FERC, to continue to regulate natural gas sales from interstate pipelines to their customers but also to specify maximum lawful prices that may be charged for all first sales of natural gas in eight defined categories of natural gas production. *See Public Service Commission v. Mid-Louisiana Gas Company,* 463 U.S. 319, 326–332, 103 S.Ct. 3024, 3029–3032, 77 L.Ed.2d 668, 676–679 (1983) ("*Mid-Louisiana*").

The NGPA has been described as "a comprehensive statute to govern future natural gas regulation." Note, *Legislative History of the Natural Gas Policy Act,* 59 Tex.L.Rev. 101, 116 (1980), quoted by the Supreme Court in *Mid-Louisiana, supra,* 463 U.S. at 331, 103 S.Ct. at 3031, 77 L.Ed.2d at 679. Title I of the NGPA establishes eight categories of natural gas production and proclaims a method for calculating an appropriate ceiling price within each category. Section 102 concerns "new natural gas and certain natural gas produced from the Outer Continental Shelf." 15 U.S.C. § 3312. Section 103 covers "new, onshore production wells." 15 U.S.C. § 3313. Section 104 regulates "natural gas

committed or dedicated to interstate commerce on the day before the date of the enactment of ..." the NGPA. 15 U.S.C. § 3314. Section 105 covers "sales under existing intrastate contracts." 15 U.S.C. § 3315. Sales under "rollover contracts" are within Section 106. 15 U.S.C. § 3316. "High-cost natural gas" is regulated by Section 107. 15 U.S.C. § 3317. Section 108 covers "stripper well natural gas." 15 U.S.C. § 3318. Section 109 concerns "any natural gas which is not covered by any maximum lawful price under any other lawful section of ..." the statute. 15 U.S.C. § 3319. Certain types of gas under §§ 102, 103 and 105 were decontrolled effective January 1, 1985, but such deregulation does not affect the gas involved in this action. Section 504(a) renders it unlawful for any person to sell natural gas at a first sale price in excess of these maximum lawful prices. 15 U.S.C. § 3414(a).

*Relevance of the NGPA to This Action*

Plaintiffs' sale of gas to InterNorth under the Contract constitutes a "first sale" of gas within the meaning of the NGPA. 15 U.S.C. § 3301(21). All gas transferred under the Contract is classified under either Section 104 or 108 of the NGPA, 15 U.S.C. §§ 3314 and 3318, which establish a maximum lawful price ceiling for such gas. The term "sale" is defined by the statute to mean "any sale, exchange, or other transfer for value." 15 U.S.C. § 3301(20).

InterNorth maintains that any effort by Plaintiffs to obtain a price for gas in excess of the NGPA ceiling prices is unlawful under § 504(a) of the statute. 15 U.S.C. § 3414(a).

*Merits of the Motion*

In *Post v. Perry Gas Transmission,* 616 F.Supp. 1, No. 2–83–158 (N.D.Tex. Dec. 15, 1983), this Court discussed the identical issue of whether referral to FERC under the doctrine of primary jurisdiction was appropriate. The Court concluded that the question of whether enforcement of take-or-pay clauses in natural gas sales contracts would violate the NGPA should be referred to FERC, and that case was duly

referred. Since that time, other courts have divided on the question of referral. *Compare Sid Richardson Carbon & Gasoline Co. v. InterNorth,* 595 F.Supp. 497 (N.D.Tex.1984) (denying referral), *with Gulf Oil Corp. v. Tenneco, Inc.,* 608 F.Supp. 1493, 1498 (E.D.La.1985) (granting referral).

For present purposes, the most significant case since *Post* is *Koch Industries, Inc. v. Columbia Gas Transmission Corp.,* Civ. No. 83990 (E.D.La.), in which Columbia, an interstate natural gas pipeline, was sued by Koch Industries, a natural gas producer, for alleged breach of gas purchase contracts between the two companies.

The lawsuit arose out of the following course of events. Alleging diminished demand for its gas, Columbia invoked the *force majeure* provisions of its gas contracts as the basis for reducing the level of its gas purchases and its gas purchase costs. In an effort to achieve this result, Columbia refused to continue to pay for certain minimum volumes of gas not taken from its suppliers, as required under the take-or-pay clauses of its gas purchase contracts.

After initiating this policy, Columbia filed a petition with the Commission in FERC Docket No. CI83–304, for a declaratory order that the enforcement of gas producers' demands that the take-or-pay provisions in their contracts with Columbia be enforced would be unlawful and violate the NGPA.

Koch filed a breach of contract action in federal court in Louisiana. In that suit, Koch alleged that Columbia's actions to reduce its gas purchase costs violated the terms of four gas purchase contracts between Koch and Columbia. Among other things, Koch alleged that the contracts required Columbia to take and pay for certain minimum volumes of gas or pay for them in any event. Koch sought specific performance.

Referring to its related filing at FERC and other proceedings at the Commission, Columbia requested that the district judge refer Koch's lawsuit to the Commission under the doctrine of primary jurisdiction. The district judge denied Columbia's request and its request to permit an interlocutory appeal of the denial. Columbia then petitioned the Fifth Circuit to issue a supervisory writ of mandamus or prohibition to require the district court to refer the relevant issues to the Commission.

The Fifth Circuit asked FERC for its views as an amicus curiae in the case and FERC complied. *In re Columbia Gas Transmission Corp.,* No. 84–3282 (5th Cir. June 19, 1984) (Opening Memorandum Brief of FERC). In relevant part, the Commission said:

1. The Court has requested a report on the "present status" of Columbia's requests in FERC Docket Nos. CI83–304 and GP84–36. At present, no formal action has been taken by the Commission in these or other relevant dockets at the Commission. The requests in these dockets raise difficult and troublesome questions concerning the proper exercise of Commission jurisdiction. Indeed, the Commission has not yet determined the permissible scope of action which it may take in these dockets.... At this point, the Commission cannot project any probable date on which action will be taken in this regard.

2. The Court has also inquired whether this case is now appropriate for the application of the doctrine of primary jurisdiction. We submit that, at this stage, it is not.

a. Because the Commission has not yet reached a decision as to how to proceed in the Commission dockets noted *supra,* referral to the Commission of any of the issues now involved in the proceeding before the district court would be inappropriate. As this Court has stated, primary jurisdiction is a "flexible doctrine" to be applied at the "discretion" of the court. There is no reason for the Court to overrule the lower court's exercise of that discretion where, as here, the agency has not yet initiated any proceedings in the relevant area.

b. Denying Columbia's petition for mandamus would not impede proper disposition of the pertinent issues. It is thus inaccurate to say, as Columbia does, that "the lower court has refused [the Commission] the opportunity to resolve issues that are critical to [its] regulation, such as the maximum lawful price issue." The Commission is free to proceed at its own reasonable pace in dealing with the novel and intractable issues in the related dockets pending before it.

. . . . .

Acting affirmatively on Columbia's petition for mandamus or prohibition is particularly inappropriate here since it appears that Columbia's petition is an attempt by the company to compel the Commission to state prematurely its substantive views in this area. It hardly needs saying that it is for the Commission—not Columbia—to decide when, how and to what extent the agency will act on matters in the gas purchasing area. "Given the complexity and difficulty of the legal and economic issues generated by [oversupplies] on an extensive pipeline system," the Commission must be able to proceed at its own pace so long as that pace is a reasonable one.

*Id.* at 4–7 (citations omitted).

In unpublished orders, the Fifth Circuit denied Columbia's petition and a petition by Tenneco involving the same issues. *In re Columbia Gas Transmission Corp.*, No. 84–3282 (5th Cir. July 30, 1984); *In re Tenneco, Inc.*, No. 84–4074 (5th Cir. July 30, 1984). Both petitions were denied because no showing had been made that the requested writs were necessary or appropriate in aid of the Fifth Circuit's jurisdiction. See 28 U.S.C. § 1651.

In the year since FERC filed its amicus brief in *Columbia Gas Transmission*, it has moved forward in at least one area of the take-or-pay controversy. On April 10, 1985, the Commission issued a Statement of Policy and Interpretive Rule in which it determined that "[a] first seller of natural gas that receives payments as consideration for amending or waiving the take-or-pay or similar minimum payment provisions of a contract for the first sale of natural gas is not in violation of § 504(a) of the NGPA." *Regulatory Treatment of Payments Made in Lieu of Take-or-Pay Obligations,* Docket No. PL85–1–000 (Federal Energy Regulatory Commission April 10, 1985). The Commission expressly recognized the question of "whether prepayments to a producer for gas not taken but which cannot be made up by the purchaser must be added to payments made to that producer for gas taken by the pipeline for purposes of determining the producer's compliance with the maximum lawful prices set out in Title I of the NGPA," and said that "[t]he present policy statement does not speak to this issue."

This Statement of Policy and Interpretive Rule illustrates the benefit of the primary jurisdiction doctrine. In reaching its conclusion, FERC relied on its knowledge of how certain payments are accounted for by pipelines for ratemaking purposes, and its previous experience with electric utilities that entered into long term contracts for the purchase of coal. This exemplifies the exercise of agency expertise in an area outside the conventional experience of judges.

At the time *Post* was decided, referral to the Commission under the doctrine of primary jurisdiction appeared appropriate. Indeed, the Court still believes that this is an area in which FERC needs to exercise its primary jurisdiction. Nevertheless, developments since the *Post* decision counsel that the instant motion should be denied.

■ One, the Commission's brief in *Columbia Gas Transmission* indicates that the Commission does not want these referrals. Application of the doctrine of primary jurisdiction is inappropriate where the administrative agency is manifestly opposed to the referral.

■ Two, "the court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible." *Mississippi Power & Light Co. v. United Gas*

*Pipe Line,* 532 F.2d 412, 419 (5th Cir.1976). Some 18 months of inaction have elapsed since this Court referred the *Post* case to FERC. In the normal course of business, the case would have already been tried and a judgment entered. These plaintiffs should not be similarly sentenced to transportation. As the Commission proceeds "at its own reasonable pace," producers and royalty owners suffer through unpredictable cash flows and are victimized by breaches of contract undertaken as deliberate, calculated business decisions. The producers, moreover, cannot abandon their obligations under the contracts without the Commission's permission, yet must maintain production in paying quantities to preserve the underlying oil and gas leases. Danden's royalty owners have already begun making inquiries as to whether the wells are being economically operated. Danden itself is a small producer. Its cash flow from this contract varies from $5000 to $120,000 per month, depending only on InterNorth's day-to-day decisions as to how much gas it will buy and from which wells. The need for an expeditious resolution of the contractual dispute is evident and, in this case, outweighs the considerations in favor of applying the primary jurisdiction doctrine.

Finally, the take-or-pay issues are already before the Commission. As the district judge in *Columbia Gas Transmission* said, "If the Federal Energy Regulatory Commission takes some sort of action, then I think we can look at the situation at that time and see whether we ought to take any other action"—a comment cited with approval in FERC's amicus brief.

The Motion to Refer is DENIED.

It is so ORDERED.