J.E. STACK, Jr., Plaintiff,

v.

TENNECO, INC. and Tennessee Gas Pipeline Company, Defendants.

Civ. A. No. E83–0143(L).

United States District Court,
S.D. Mississippi, E.D.

June 25, 1986.

■■■■■■■■■■■■■

Glenn Gates Taylor, Copeland, Cook, Taylor & Bush, Jackson, Miss., for plaintiff.

Peyton S. Irby, Jr., John H. Holloman, III, Ernest G. Taylor, Jr., Watkins, Ludlam & Stennis, Jackson, Miss., for defendants.

## AMENDED MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause came before the court for a hearing on the motion of plaintiff J.E. Stack, Jr. for a preliminary injunction. In the motion, plaintiff requests that this court order defendants Tenneco, Inc. and Tennessee Gas Pipeline Co. (Tennessee) (1) to desist from recouping prepayments previously tendered at a rate in excess of the thirty percent rate established in the contract between the parties, (2) to immediately pay plaintiff at least the minimum amount presently owing under the contract, and (3) to begin taking gas from the J.E. Stack-Fernwood Lumber Company Well No. 1 (the new well) which was completed in November 1985 and shut-in by Tennessee on January 20, 1986. Following review of the evidence adduced at the bench hearing, the court makes the following findings of fact and conclusions of law.

The pertinent facts are briefly summarized.[1] The gas contract between Stack and Tennessee was ratified by Stack and signed by representatives of Tennessee on March 22, 1982. The contract contains no market-out clause. It does contain a "take-or-pay" provision which requires Tennessee to take-or-pay for gas at a rate of eighty-five percent of Stack's deliverability capacity. Additionally, the contract provides that Tennessee make pre-initial delivery payments (prepayments) to Stack for gas dedicated to the contract but not taken by Tennessee. In 1982, Tennessee made such prepayments to Stack in the total amount of some $3,400,000.00. This figure represented payment for some 435,000,000 cubic feet (referred to herein as 435,000 Mcf, Mcf representing thousand cubic feet) of gas at prices ranging between $7.00 and $9.00 per Mcf. Through March 1986, Tennessee had received 256,101 Mcf of gas from the Stack wells in the Morgantown area of Marion County, Mississippi, leaving a deficit of some 179,000 Mcf against the prepayment amount. The contract expressly limits Tennessee's right to recoup the prepayment amount to receiving a credit of up to thirty percent on all gas volumes subsequently taken from Stack's wells. Tennessee's obligation to make monthly payments to Stack for the remaining seventy percent of the gas taken remained unaffected by the prepayment, so long as Stack retained sufficient gas reserves in his wells to allow Tennessee to recoup all volumes for which it had prepaid. The contract grants Tennessee the right to demand cash repayment from Stack for all unrecovered volumes should the reserves fall below a level sufficient to allow Tennessee to recoup its prepayment.

On April 29, 1983, Tennessee announced its Emergency Gas Purchase Program (EGPP), whereby Tennessee unilaterally reduced the price it would pay for gas actually taken and its annual minimum payment on its take-or-pay and severance tax obligations under the contract. The EGPP declared that Tenneco would pay no more than 110% of the No. 2 fuel oil index as published monthly for all amounts of gas actually taken from Stack's wells. As to its take-or-pay obligation under the Stack contract, Tennessee declared through its EGPP that it would pay for no more than the lesser of fifty percent of Stack's delivery capacity of each category of gas or the minimum contract quantity provided under the contract. Stack refused to accede to Tennessee's demand that he agree to the

---

1. For a more fully developed outline of the genesis of this litigation, *See Stack v. Tenneco, Inc.,* 622 F.Supp. 152, 152–54 (S.D.Miss.1985).

*See also Forest Oil Corp. v. Tenneco, Inc.,* 626 F.Supp. 917, 919–21 (S.D.Miss.1986).

EGPP within one month, and Tennessee thereafter terminated all take-or-pay obligations.

On June 13, 1983, Tennessee notified Stack that it had determined that insufficient gas reserves were present in Stack's wells to allow it to recoup its prepayment, and demanded that Stack immediately repay the balance owing on the prepayment. Stack likewise refused to accede to this demand and Tennessee began recouping its prepayment from 100% of Stack's production, in direct contravention of the contract provision allowing recoupment at a maximum of thirty percent of production. Stack has received no payments whatever from Tennessee since July 1983, although Tennessee has continued to take gas from Stack's wells.

Oil and gas exploration in the Morgantown area did not cease in the wake of Tennessee's actions in 1983. In November 1985, Stack completed and tested the new well in the area of the Morgantown field dedicated to the Stack-Tennessee contract. Tennessee began taking gas from the new well on January 14, 1986, but then shut-in the well on January 20, 1986. The testimony from the various experts who testified during the hearing clearly established that the reserves existing in the new well exceed the level required to allow full recoupment of the prepayment by Tennessee under the terms of the contract at a rate of thirty percent of production. Tennessee did not substantially deny that such reserves exist in the new well. Instead, Tennessee engaged in high sophistry at trial, arguing that it did not begin complying with the contract provisions for recouping the prepayment because of a company policy, not to be found in the contract, allowing recoupment to be made only against those wells extant and dedicated to the contract at the time of prepayment, and because of a contract provision allowing Tennessee to nominate the gas it will take and in what amounts, which provision, Tennessee argued, gives it the right to shut-in wells. Tom Matthews, Tennessee's vice-president in charge of world-wide gas transmission and the author of the EGPP, testified that he interpreted the contract to give Tennessee the right to make prepayment, to shut-in all producing wells dedicated to a contract upon determining that no gas was needed, and then, so long as the reserves remain sufficient over the life of the contract, to recoup the full prepayment from the producer at the end of the contract term. In essence, Matthews concluded, the contract gave Tennessee the right to make a long-term, no-interest loan to producers in exchange for their tying up their producing wells for the life of the contract. The court has no hesitation in rejecting such interpretation which entirely frustrates the intent and purpose underlying the contract. Tennessee alternatively argued that damage to the new well occasioned by the shut-in can be alleviated by Stack's selling the gas to Endevco, Inc., an interstate pipeline system, which has offered to buy the gas at a price some $5.00 to $6.00 less per Mcf than Tennessee is required to pay under the contract. Tennessee lastly argued that since the EGPP expired by its own terms on December 31, 1985, new developments in the nature of regulatory actions by the Federal Energy Regulatory Commission have constituted events of force majeure allowing it to suspend its obligations under the contract. For his part, Stack contends that the well machinery and the underground reservoir tapped by the well will suffer irreparable damage if the well is left shut-in. Much testimony was adduced by Stack's experts concerning the high concentration of carbon dioxide in the well deposits, which, if the well were left shut-in, would mix with water to produce carbonic acid causing irreparable damage to well tubing and casing. Stack concludes that the potential damage to the productive sands, combined with the possibility that offset wells could drain the reservoir, constitutes a loss for which payment in money damages is incalculable.

It is undisputed that the gas produced and available for production from Stack's wells qualifies as deregulated, high-cost gas under § 107 of the Natural Gas Policy Act of 1978. It is undisputed that Tennes-

see withheld payment of $846,000.00 to Stack to cover the shortfall it anticipated from Stack's wells, and for severance taxes, which shortfall, Tennessee admits, will not occur as a result of the discoveries occasioned by the new well, if any shortfall ever existed. It is undisputed that Tennessee did not comply with its contractual obligation to make severance tax payments to the Mississippi State Tax Commission on gas taken from Stack's wells before it assumed such obligation in March 1984, and that Stack has a current severance tax obligation of approximately $102,000.00. Tennessee pled oversight as a defense to their failure to make the severance tax payment. Lastly, it is undisputed that Tennessee presently has the ability to take Stack's gas and comply with all payment provisions of the contract. There remains some dispute concerning the respective obligations of Stack and Tennessee to make payment to royalty interest owners in the Stack wells. Tennessee takes the position that payments to royalty interest owners were included in the initial prepayment sum to be disbursed by the controlling interest owner, Stack. Stack contends that Tennessee has remaining obligations to the royalty owners.

■ The criteria for the issuance of a preliminary injunction are well settled in the Fifth Circuit. The moving party must demonstrate:

1. A substantial likelihood that the movant will prevail on the merits;

2. A substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

3. That the threatened injury to the movant outweighs the threatened harm the injunction may do to the nonmoving party; and

4. That granting the preliminary injunction will not disserve the public interest. *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). A preliminary injunction is extraordinary relief and should only be granted upon a clear showing by the plaintiff. *Id.*

## SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

There is presently pending before the court in this cause Stack's motion for summary judgment on liability. In its brief in response to the instant motion and in argument at the hearing, Tennessee did not materially dispute that Stack has made the requisite showing of substantial likelihood of success, and only cautioned the court not to engage in determining the merits of the motion for summary judgment in this context. The court heeds this caution and concludes that Stack has made a clear showing of substantial likelihood of success on the merits of all his claims. The court reserves for later ruling the issues relating to the efficacy of Tennessee's EGPP and its various commercial impracticability and force majeure defenses.

## IRREPARABLE INJURY

In *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464 (5th Cir.1985), the Fifth Circuit delineated the various refinements to the *Canal Authority* factors fostered by its progeny. With specific regard to the irreparable injury factor, the court quoted from *Morgan v. Fletcher,* 518 F.2d 236, 240 (5th Cir.1975), and *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir. 1958), to the following effect:

"The key word is *irreparable,*" and an "injury is 'irreparable' only if it cannot be undone through monetary remedies." Thus, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[ ]s [sic] heavily against a claim of irreparable harm."

*Enterprise International,* 762 F.2d at 472–73 (emphasis original).

■ Thus, the court's equitable powers can be properly invoked only upon a showing that a money damages recovery will be insufficient to remedy the injury that the movant is presently suffering.

The court does not read this limitation on its power to do equity as a bar to fashioning injunctive relief when the non-movant can show no equitable considerations inherent in its position. In this case, Stack has received *nothing* for the volumes taken from his well or in take-or-pay payments since July 1983. Since that time, Stack has had no funds other than his own to service his debts and expenses incurred for the substantial investment in deep, expensive gas wells. *See Sid Richardson Carbon & Gasoline Co. v. Internorth, Inc.,* 595 F.Supp. 497, 501 (N.D.Texas 1984). He is not free under the contract to sell to other purchasers absent a release from Tennessee, and then he could only sell to buyers such as Endevco at prices far below the contract price and without the benefit of an assured duration of the take or any protective contractual provisions normally offered the seller in an arm's length negotiation.

Two sums presently due and owing by Tennessee to Stack are essentially undisputed. They do not implicate the efficacy of Tennessee's EGPP, commercial impracticability or force majeure defenses. They are the $846,000.00 sum withheld by Tennessee to offset the assumed shortfall in Stack's production and the $102,000.00 sum due in severance taxes which Tennessee failed to pay by oversight. The court acknowledges that such sums certain normally are not subject to award in the context of a preliminary injunction. Here, however, the court is faced with an absolute absence of any equitable reason for allowing Tennessee to retain these funds. Additionally, Stack adduced testimony, unrebutted by Tennessee, that he has not been able to make various timely payments to his investors or on his debt service, and that litigation over amounts he owes to investors has been threatened. Therefore, the court is of the opinion that Stack has made the requisite showing of irreparable injury if he is further deprived of the $846,000.00 and $102,000.00 sums pending a trial on the merits.

Stack also requests a preliminary injunction ordering Tennessee (1) to stop recouping its prepayments in excess of the contract rate of thirty percent, (2) to pay Stack for seventy percent of his gas which Tennessee has taken since June 1983 at the price set forth in the contract as the minimum price it owes Stack under its EGPP ("110% of the No. 2 fuel oil index"), and (3) to pay Stack take-or-pay monies Tennessee has acknowledged is the minimum rate it owes Stack ("50% of Seller's Delivery Capacity"). This requested relief intimately involves the merits of this controversy, namely, the efficacy of Tennessee's EGPP, commercial impracticability and force majeure defenses. These requests are likewise capable of reduction to a sum certain in money damages. Stack made no showing of irreparable commercial injury should an award of any such damages be delayed pending a determination on the merits. In the absence of such a showing, the court will not plunge into the merits to enforce selected provisions of the contract in a preliminary injunction context when money damages awarded after full litigation will make the movant whole. The court concludes that Stack has not made the requisite showing of irreparable injury as to this requested relief.

Likewise, the question of well damage necessarily implicates the merits of Tennessee's defenses and the conflicting interpretations the parties place upon various contract provisions. While Stack's experts testified that prolonged exposure to carbonic acid could damage the well's tubing and casing and may result in obstruction by shifting clay formations of the perforated tubing extending into the reservoir, there was no testimony that such was presently occurring or that the well would be rendered unproductive by delaying start-up pending a trial on the merits. To the extent that well damage might be occurring, Stack has available to it the option of selling the well's production to Endevco, thus alleviating the immediate problem. Such existing option would also be relevant, upon proper proof, on the question of mitigating damages. A finding of irreparable injury would be compelled by proof that

offset wells were tapping into the new well's reservoir, or that the reservoir energy was being dissipated in any apparent way.[2] Plaintiff's expert has, however, determined that the new well has an open-flow potential of 5.4 million cubic feet per day. This potential output and the fact that any well machinery which might be damaged by a prolonged shut-in is presumably replaceable are likewise reducible to a sum certain in money damages should Stack prevail on the merits. Standing in the way of Stack's recovery of such sums are Tennessee's chief defenses to its liability under the contract, which again, this court is reluctant to adjudicate on a motion for preliminary injunction. Therefore, the court is of the opinion that Stack has not made the requisite showing of irreparable injury with respect to the shutting-in of the new well.

## BALANCE OF THE HARM

▇ As stated previously, Stack has received no monies from Tennessee for the production of his wells since July 1983. The court concludes that depriving Stack of the $846,000.00 and $102,000.00 concededly owing from Tennessee would serve no practical or equitable function. The balance of the harms weighs solely in favor of Stack as to these amounts. The court cannot strike the same balance with respect to Tennessee's minimum payment for production or take-or-pay payments under the contract. Should Tennessee prevail in whole or in part on any of its enumerated defenses to contract liability, any payments it made under this preliminary injunction would have to be recouped or forfeited. Where the primary harm claimed in the absence of an injunction is monetary, or where the harm is equivalent in that both parties claim the right to disputed funds, an injunction is improper. *See Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384 (5th Cir.1984); *Danden Petroleum v. Northern Natural Gas Co.*, 615 F.Supp.

1093 (N.D.Texas 1985). Thus, the court is of the opinion that the balance of the harms weighs in favor of Tennessee except for the above-stated, undisputed amounts.

## PUBLIC INTEREST

At this stage of the litigation, it is difficult to determine the effect that issuance of a preliminary injunction would have upon the public. Stack urges that it is in the public interest to prevent Tennessee's unilateral breach of contract and its attempt to rewrite provisions of the contract to protect its profitability. *Sid Richardson*, 595 F.Supp. at 501. Tennessee raises the spectre of increased consumer costs if it is forced to honor the pricing and take-or-pay provisions of the contract. Protecting the downstream consumers of such gas from higher prices has been deemed a concern of "vital" public interest. *Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 623–24 (5th Cir.1985); *Danden Petroleum*, 615 F.Supp. at 1099. The court is of the opinion that the public interest would best be served by allowing Tennessee to develop its defenses upon a full hearing on the merits. Stack introduced no evidence that his business cannot remain active and viable until such time. Accordingly, the court is of the opinion that the public interest does not mandate issuance of the preliminary injunction.

## CONCLUSION

In its essence, the instant motion for preliminary injunction is a prayer for the equitable remedy of specific performance of the contract. Although Stack has made a clear showing of substantial likelihood of success on the merits, the court concludes that he has not sustained the burden of establishing irreparable harm should the injunction not issue. Immediate payment of the undisputed amounts, $846,000.00 and $102,000.00, should alleviate the threat of irreparable injury at least until such time

2. The court is of the opinion that the existing condition of the new well does not constitute "waste" within the meaning of Miss.Code Ann. §§ 53-1-1 and 53-1-3(k). Therefore, Stack must make the requisite showing of irreparable harm and that the balance of the harms weighs in his favor.

as this case is tried on its merits. Therefore, the court will not undertake to examine the viability of Tennessee's defense or the precise amount of any contractual liability in the limited context of a preliminary injunction proceeding.

Accordingly, the court is of the opinion that plaintiff's motion for a preliminary injunction should be denied, except that an order should enter granting Stack's motion to the extent of the undisputed amount owed by Tennessee in the sum of $948,000.00, which should be paid immediately upon the filing of the order. A separate order shall be submitted according to the local rules.